UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
HUAYUAN CHEN,

                    Plaintiff,

  -against-

STONY BROOK UNIVERSITY,
EDWARD W. TESTA, JR., &
KATHLEEN LEVINESS,

                    Defendants.
----------------------------------------------------------X

**REPORT AND**
**RECOMMENDATION**
CV 15-6698 (JMA)(AYS)

**SHIELDS, ANNE Y., United States Magistrate Judge:**

      Plaintiff, Huayuan "Lisa" Chen ("Plaintiff"), commenced this action on November 23, 2015, asserting claims of employment discrimination against her former employer, Defendant Stony Brook University ("SBU"), and individual Defendants Edward W. Testa, Jr. ("Testa"), and Kathleen Le Viness ("Le Viness") (collectively, "Defendants"). Specifically, Plaintiff alleges that she was subjected to discrimination based upon her age and national origin in violation of 42 U.S.C. § 1983 ("Section 1983"), Title VII of the Civil Rights Act of 1964 ("Title VII"), as codified, 42 U.S.C. §§ 2000e et seq., and the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law §§ 290 et seq., which culminated with Plaintiff's alleged unlawful termination on November 14, 2014.

      Presently before the Court is Defendants' motion for summary judgment, pursuant to Federal Rule of Civil Procedure 56. Plaintiff opposes the motion. For the following reasons, this Court respectfully recommends that Defendants' motion be granted.

1

BACKGROUND

The relevant facts, as set forth below, are taken from the parties' Local Civil Rule 56.1 Statements of undisputed material facts. The Court notes that Defendants filed a Statement of Material Facts, (Docket Entry ("DE") [126-13]), and Plaintiff filed a Response and Counter-Statement, (DE [126-23], [126-24]), in compliance with Local Civil Rule 56.1. However, Plaintiff then filed a separate "56.1 Counter Statement of Material Facts," (DE [130]), which is irrelevant since Plaintiff is not moving for summary judgment herein, but rather is merely responding to Defendants' motion. Accordingly, the Court will disregard Plaintiff's additional Counter-Statement of Material Facts, and refer only to Defendants' Rule 56.1 Statement and Plaintiff's Response and Counter-Statement thereto. The Court further notes that while Plaintiff's response to the vast majority of Defendants' material facts is to state "Deny," her explanation in support of her denial often fails to actually deny the statement proffered by Defendants, instead offering seemingly irrelevant information. Defendants' statements, which are therefore not actually denied, are deemed admitted.

On or about January 9, 2014, Plaintiff applied for a Lead Programmer/Analyst position with Stony Brook University. (Def. Local Civ. R. 56.1 Statement ("Def. 56.1 Stmt.") ¶ 3; Pl. Local Civ. R. 56.1 Statement ("Pl. 56.1 Stmt.") ¶ 3.) The position required the ability to work with SBU's databases, create programs, generate succinct reports, organize data, and extract data from a database that is constantly changing and growing, to assist the mission of fundraising. (Def. 56.1 ¶ 3; Pl. 56.1 ¶ 3.) This was not an entry level position, instead requiring advanced computing skills. (Def. 56.1 ¶ 4; Pl. 56. ¶ 4.)

Plaintiff was initially interviewed for the Lead Programmer/Analyst position by a search committee, of which Susan Agro ("Agro"), another Lead Programmer/Analyst, was a member,

who recommended hiring Plaintiff. (Def. 56.1 ¶ 5; Pl. 56.1 ¶ 5.) Plaintiff was then interviewed separately by Defendant Le Viness, who, at that time, was the Director for Data Services, Defendant Testa, Associate Vice President for Advancement Services, and Dexter Bailey ("Bailey"), Senior Vice President for University Advancement. (Def. 56. ¶ 6; Pl. 56.1 ¶ 6.) Le Viness is supervised by Testa, who, in turn, is directly supervised by Bailey. (Def. 56.1 ¶ 7; Pl. 56.1 ¶ 7.)

During her interview, Plaintiff represented that she was proficient in SQL, Access and Excel. (Def. 56.1 ¶ 11; Pl. 56.1 ¶ 11.) Plaintiff's resume submitted with her employment application specifically listed Excel and Access 2007 as some of her technical skills. (Def. 56.1 ¶ 12; Pl. 56.1 ¶ 12.) While Bailey had concerns about whether Plaintiff could learn the business of Advancement to be able to carry out the job successfully – and actually preferred hiring another candidate, a Caucasian woman – he ultimately agreed to hire Plaintiff based upon Testa's recommendation. (Def. 56.1 ¶ 14; Pl. 56.1 ¶ 14.) Upon the conclusion of the interview process, Plaintiff was offered a one-year term appointment as a Lead Programmer/Analyst. (Def. 56.1 ¶ 15; Pl. 56.1 ¶ 15.)

Plaintiff commenced her employment with SBU's Advancement Department on March 12, 2014, reporting directly to Le Viness. (Def. 56.1 ¶ 16; Pl. 56.1 ¶ 16.) In her position, Plaintiff was expected to utilize her programming skills to generate reports following the end user's requirements, transmit financial data from the Raiser's Edge database (which holds information about alumni and donors, their donations, their addresses and other information) to Stony Brook Foundation's financial database, generate alumni census and to perform analyses of donations. (Def. 56.1 ¶ 17; Pl. 56.1 ¶ 17.)

Plaintiff was initially assigned projects to be completed under Agro's guidance, who had experience with the types of projects given to Plaintiff. (Def. 56.1 ¶ 24; Pl. 56.1 ¶ 24.) During the first project assigned to Plaintiff in March 2014, it became apparent to Defendants that Plaintiff was not proficient in Excel, as she had represented on her resume and during her interview. (Def. 56.1 ¶ 30; Pl. 56.1 ¶ 30.) At Agro's suggestion, Plaintiff signed up for both an "Excel for Beginners" class and a training course on Raiser's Edge. (Def. 56.1 ¶¶ 30-31; Pl. 56.1 ¶¶ 30-31.)

The next project assigned to Plaintiff, also in March 2014, was called the SQL Server Integrated System assignment and related to the daily updates of gifts that were currently being entered into Raiser's Edge and feeding over to PeopleSoft, a financial system, using an Oracle program. (Def. 56.1 ¶ 38; Pl. 56.1 ¶ 38.) SBU wanted to start using SQL instead of Oracle for this daily financial feed and the assignment was for Plaintiff to rewrite the program from Oracle to SQL, based on her representation on her resume that she was proficient in SQL. (Def. 56.1 ¶¶ 39, 41; Pl. 56.1 ¶¶ 39, 41.) Defendants considered the level of complexity of the project to be moderate and expected Plaintiff to complete the assignment within two weeks to a month; however, Plaintiff struggled with this assignment as well. (Def. 56.1 ¶¶ 41, 45.) Plaintiff ultimately finished the assignment on April 30, 2014, which Defendants did not consider to be in a timely manner. (Def. 56.1 ¶ 50; Pl. 56.1 ¶ 50.)

Defendants found that Plaintiff continued to struggle with the assignments given to her, with Le Viness having to complete one of Plaintiff's projects herself. (Def. 56.1 ¶¶ 52-67.) Le Viness raised concerns with Testa regarding Plaintiff's performance and they contacted Human Resources for guidance on how to proceed. (Def. 56.1 ¶ 73; Pl. 56.1 ¶ 73.) On May 14, 2014, Le Viness met with Plaintiff and reviewed her Performance Program for the year March 12, 2014

4

to March 11, 2015 to confirm that Plaintiff fully understood her duties as a Lead Programmer/Analyst. (Def. 56.1 ¶ 74; Pl. 56.1 ¶ 74.)

Also on May 14, 2014, Le Viness assigned Plaintiff to create the monthly RuffaloCody education file and gave her written instructions and documentation to assist her in the completion of the project. (Def. 56.1 ¶ 75; Pl. 56.1 ¶ 75.) Le Viness also requested that Agro assist Plaintiff with the report since she had previously been responsible for this monthly filing. (Id.) During the course of the project, Plaintiff made various complaints to Le Viness about Agro, and Agro expressed frustration about working with Plaintiff. (Def. 56.1 ¶¶ 76-77, 85.)

On May 21, 2014, the Executive Director of the Annual Fund, Anthony Cernera, notified his direct supervisor, Greg Duyck, Senior Associate Vice President, and Testa, that Plaintiff had shared concerns with him about working with Agro. (Def. 56.1 ¶ 88; Pl. 56.1 ¶ 88.) A meeting was held that same day with Plaintiff, Testa and Le Viness to discuss any issues Plaintiff was having with Agro. (Def. 56.1 ¶ 89; Pl. 56.1 ¶ 89.) At the meeting, Plaintiff informed Testa that she no longer wanted to work with Agro. (Pl. 56.1 ¶¶ 89, 91.) Plaintiff was instructed to work directly with Le Viness from that point forward. (Def. 56.1 ¶ 97; Pl. 56.1 ¶ 97.)

Problems with Plaintiff's performance continued, (Def. 56.1 ¶¶ 100-16), and, on May 30, 2014, Testa emailed Bailey that he had decided to move forward with Human Resources to terminate Plaintiff. (Def. 56.1 ¶ 117; Pl. 56.1 ¶ 117.) On June 9, 2014, Testa met with Human Resources to review employment issues with Plaintiff and to seek advice on counseling approaches and next steps. (Def. 56.1 ¶ 124; Pl. 56.1 ¶ 124.) Human Resources advised Testa

5

that a counseling session was needed with Plaintiff to discuss her inability to follow instruction, her failure to collaborate with coworkers and the areas for needed improvement.[1]  (Id.)

As a result of Plaintiff's unsuccessful working relationship with Agro and Le Viness, Testa began giving assignments directly to Plantiff.  (Def. 56.1 ¶ 128; Pl. 56.1 ¶ 128.)  Plaintiff continued to struggle with the assignments given to her.  (Def. 56.1 ¶ 137; Pl. 56.1 ¶ 137.)  On June 17, 2014, Testa met with Plaintiff and Le Viness in his office.  (Def. 56.1 ¶ 134; Pl. 56.1 ¶ 134.)  Following the meeting, Testa emailed Human Resources stating, "[w]e have tried multiple approaches/projects and unfortunately not making any progress" with respect to Plaintiff.  (Def. 56.1 ¶ 135; Pl. 56.1 ¶ 135.)

In August and September 2014, Defendants assigned Plaintiff additional projects to complete.  Plaintiff continued to have difficulty with the assignments.  (Def. 56.1 ¶ 143-61.)  On September 11, 2014, Testa forwarded Human Resources Plaintiff's six-month evaluation that he and Le Viness had drafted.  (Def. 56.1 ¶ 162; Pl. 56.1 ¶ 162.)  On October 24, 2014, Testa proposed a plan for meeting with Plaintiff regarding her six-month evaluation and moving forward with her termination, which was approved by Human Resources on October 31, 2014.  (Def. 56.1 ¶ 166; Pl. 56.1 ¶ 166.)

On November 3, 2014, Plaintiff met with Le Viness, Testa and Jean Drelick ("Drelick"), the Advancement Department's Office Manager, who served as a Human Resources representative for the meeting.  (Def. 56.1 ¶ 168; Pl. 56.1 ¶ 168.)  Plaintiff was given her six-month evaluation during the meeting, in which Testa and Le Viness provided her an

---

[1] Defendants assert that a meeting took place between Testa, Le Vinesss and Plaintiff on June 12, 2014, during which Plaintiff was given her three-month review and a verbal counseling session on her performance issues.  (Def. 56.1 ¶ 125.)  Plaintiff denies that any such meeting took place. (Pl. 56.1 ¶ 125.)

6

unsatisfactory assessment and stated that they did not recommend renewal of her term appointment. (Def. 56.1 ¶ 169; Pl. 56.1 ¶ 169.) Plaintiff refused to sign her evaluation, which Drelick noted on the evaluation. (Def. 56.1 ¶ 171; Pl. 56.1 ¶ 171.) When Plaintiff left work that day, she was followed by the University Police, who brought Plaintiff to the Comprehensive Psychiatric Emergency Program ("CPEP") for evaluation.[2] (Def. 56.1 ¶¶ 180-81; Pl. 56.1 ¶¶ 180-81.)

Plaintiff returned to work the next day. (Def. 56.1 ¶ 182; Pl. 56.1 ¶ 182.) While the parties dispute Plaintiff's behavior that morning, it is undisputed that Le Viness and Testa went to speak with Bailey about Plaintiff that morning. (Def. 56.1 ¶ 185; Pl. 56.1 ¶ 185.) Le Viness advised Bailey that Plaintiff began screaming at her when she arrived for work that morning and Bailey then called the University Police. (Def. 56.1 ¶¶ 186-87; Pl. 56.1 ¶¶ 186-87.)

Bailey moved all of the other employees off the floor prior to the arrival of the University Police. (Def. 56.1 ¶ 188; Pl. 56.1 ¶ 188.) Plaintiff sent an email to Bailey during that morning, stating that he "put [her] at [sic] bad situation," that she "was asked to do illegal financial report and to do data statistics with illegal business requirement," and that she "taught [Le Viness] and [Agro], they wouldn't listen." (Def. 56.1 ¶ 189; Pl. 56.1 ¶ 189.) The University Police then arrived and spoke with Bailey and Testa. (Def. 56.1 ¶ 190; Pl. 56.1 ¶ 190.) Again, Plaintiff was taken to CPEP. (Def. 56.1 ¶ 192; Pl. 56.1 ¶ 192.)

By letter dated November 4, 2014, Plaintiff was notified that her term appointment as a Lead Programmer/Analyst would not be renewed and would end on March 11, 2015. (Def. 56.1 ¶ 194; Pl. 56.1 ¶ 194.) Defendants further notified Plaintiff that as per the contract between the

---

[2] The parties dispute Plaintiff's behavior that day and whether she voluntarily agreed to go to CPEP.

7

United University Professions and the State of New York, SBU was exercising its authority to pay the balance of her salary for the time remaining on her one-year appointment, which she would receive as one lump-sum payment. (Id.) Plaintiff was issued a check on December 3, 2014 in the amount of $27,845.00, representing the balance of her salary for the remainder of her one-year term. (Id.)

Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission on March 30, 2015 and was issued a Right to Sue Letter on October 29, 2015. (Compl. DE [1].) Plaintiff then commenced this action pro se on November 23, 2015, alleging national origin and age discrimination in violation of Title VII and the Age Discrimination in Employment Act of 1967, as codified, 29 U.S.C. §§ 621-34. (Id.) Plaintiff thereafter obtained counsel and an Amended Complaint was filed on February 29, 2016, asserting claims for national origin discrimination under Title VII, Section 1983, and the NYSHRL and for age discrimination under the NYSHRL. (Am. Compl., DE [13].) On May 17, 2016, Plaintiff's counsel was granted leave to withdraw from this action, based upon their motion. (DE [19]; Order of Shields, M.J., dated May 17, 2016.) Plaintiff obtained new counsel, who filed a notice of appearance on June 17, 2016. (DE [20].) However, that attorney subsequently moved to withdraw his representation, (DE [77]), which was granted by the Court on July 30, 2018. (DE [79].) Plaintiff has been appearing pro se since that time.

After a very protracted discovery period, with numerous extensions granted and multiple motions to compel made and ruled upon, Defendants now move for summary judgment, seeking judgment in their favor, as a matter of law, with respect to all of the causes of action brought by Plaintiff. Plaintiff opposes the motion, except with respect to the claim for age discrimination

under the NYSHRL, which Plaintiff fails entirely to address in her opposition to the within motion. The Court now turns to the merits of the motion.

## DISCUSSION

I.  Legal Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the moving party to establish the lack of any factual issues. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The very language of this standard dictates that an otherwise properly supported motion for summary judgment will not be defeated because of the mere existence of some alleged factual dispute between the parties. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). Rather, the requirement is that there be no "genuine issue of material fact." Id. at 248.

The inferences to be drawn from the underlying facts are to be viewed in the light most favorable to the non-moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588 (1986). When the moving party has carried its burden, the party opposing summary judgment must do more than simply show that "there is some metaphysical doubt as to the material facts." Id. at 586. In addition, the party opposing the motion "may not rest upon the mere allegations or denials of his pleadings, but . . . must set forth specific facts showing there is a genuine issue for trial." Anderson, 477 U.S. at 248.

When considering a motion for summary judgment, the district court "must also be 'mindful of the underlying standards and burdens of proof' . . . because the evidentiary burdens that the respective parties will bear at trial guide the district courts in their determination of summary judgment motions." SEC v. Meltzer, 440 F. Supp. 2d 179, 187 (E.D.N.Y. 2006)

9

(quoting Brady v. Town of Colchester, 863 F.2d 205, 211 (2d Cir. 1988)) (internal citations omitted).  "Where the non-moving party would bear the ultimate burden of proof on an issue at trial, the burden on the moving party is satisfied if he can point to an absence of evidence to support an essential element of the non-movant's claim."  Meltzer, 440 F. Supp. 2d at 187.

Motions for summary judgment in employment discrimination actions should be evaluated with special care.  See Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997) (citations omitted).  Since "direct evidence of an employer's discriminatory intent will rarely be found, 'affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.'"  Id. (quoting Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1224 (2d Cir. 1994)).  Even in the discrimination context, however, a plaintiff "must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment."  Schwapp, 118 F.3d at 110 (citing Meiri v. Dacon, 759 F.2d 989, 998 (2sd Cir. 1985)).

II.     Plaintiff's Title VII and Section 1983 Claims Fail as a Matter of Law

   A.     Legal Standards

Pursuant to Title VII, it is "an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Section 1983 and the Equal Protection Clause also protect public employees from various forms of employment discrimination.  See Demoret v. Zegarelli, 451 F.3d 140, 149 (2d Cir. 2006); Chizman v. Nassau Bd. Of Cooperative Educ. Servs., No. 14-CV-5910, 2015 WL 13721528, at *3 (E.D.N.Y. Aug. 20, 2015).  Section 1983 requires the plaintiff to establish two

10

elements: "(1) the violation of a right secured by the Constitution and laws of the United States, and (2) the alleged deprivation was committed by a person acting under color of state law." Clay v. County of Suffolk, 404 F. Supp. 3d 737, 753 (E.D.N.Y. 2019) (quoting Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 87-88 (2d Cir. 2015)). "To survive a motion for summary judgment, a plaintiff claiming discrimination under Title VII . . . and § 1983 must satisfy the tripartite burden-shifting test enumerated in McDonnell Douglas Corp. v. Green, [411 U.S. 792 (1973)]." Sotomayor v. City of New York, 862 F. Supp. 2d 226, 251 (E.D.N.Y. 2012).

      B.      The McDonnell Douglas Burden-Shifting Framework

Pursuant to the McDonell Douglas framework, the first step of the burden-shifting analysis requires Plaintiff to establish a prima facie case of discrimination by showing: (1) membership in a protected class; (2) qualification for her position; (3) an adverse employment action; and (4) that such action occurred under circumstances giving rise to an inference of discrimination. See Ruiz v. County of Rockland, 609 F.3d 486, 491-92 (2d Cir. 2010); Matima v. Celli, 228 F.3d 68, 79 (2d Cir. 2000). The Second Circuit has held that a plaintiff's prima facie burden is de minimis. See Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 467 (2d Cir. 2001). Nonetheless, in order to state a prima facie case of discrimination, "a plaintiff must proffer some admissible evidence of circumstances that would be sufficient to permit an inference of discriminatory motive." Bennett v. Watson Wyatt & Co., 136 F. Supp. 2d 236, 246 (S.D.N.Y. 2001), aff'd, 51 F. App'x 55 (2d Cir. 2002). Plaintiff's burden is not satisfied through reliance on unsupported assertions, see Goenaga v. March of Dimes Birth Defects Foundation, 51 F.3d 14, 18 (2d Cir. 1995), or "[s]tatements that are devoid of any specifics, but replete with conclusions." Griffin v. Ambika Corp., 103 F. Supp. 2d 297, 308 (S.D.N.Y. 2000) (quoting Bickerstaff v. Vassar Coll., 196 F.3d 435, 451-52 (2d Cir. 1999)).

11

Once Plaintiff satisfies this initial burden, "the employer is required to offer a legitimate, non-discriminatory business rationale for its conduct." Feingold v. New York, 366 F.3d 138, 152 (2d Cir. 2004) (citing McDonnell Douglas, 411 U.S. at 802). Like Plaintiff's prima facie burden, Defendant's burden of showing legitimate non-discriminatory reasons is similarly "light." Greenway v. Buffalo Hilton Hotel, 143 F.3d 47, 52 (2d Cir. 1998). Thus, Defendant is required only to "articulate an explanation that, if true, would connote lawful behavior." Id. "The burden is one of production, not persuasion." Reeves v. Sanderson Plumbing Prods. Inc., 530 U.S. 133, 142 (2000) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993)).

If Defendant satisfies its burden of production, Plaintiff's prima facie presumption is rebutted and "drops from the case." Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 255 n.10 (1981). The burden then shifts back to Plaintiff "to prove 'by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" Back v. Hastings on Hudson U.F.S.D., 365 F.3d 107, 123 (2d Cir. 2004) (quoting Burdine, 450 U.S. at 258). Despite the shifting of burdens of production under the McDonnell Douglas framework, the ultimate burden of persuasion as to whether there was intentional discrimination "remains at all times with the plaintiff." Burdine, 450 U.S. at 253.

    C.    Plaintiff's Claim of Discrimination

Plaintiff asserts that Defendants discriminated against her on the basis of her national origin. As stated above, to establish a prima facie case of discrimination, Plaintiff must demonstrate that she is a member of a protected class, was qualified for the position she held, and suffered an adverse employment action under circumstances giving rise to an inference of discrimination. See Baldwin v. North Shore Univ. Hosp., 470 F. Supp. 2d 225, 228 (E.D.N.Y. 2007). There is no dispute here that Plaintiff has established the first and third elements of a

12

prima facie case – she is a member of a protected class, having been born in China, and she suffered an adverse employment action when Defendants decided not to renew her term appointment.

With respect to the second element, however, Plaintiff and Defendants vehemently dispute whether Plaintiff was qualified for the position she held of Lead Programmer/Analyst. It is clear from the evidence proffered by Defendants – much of which Plaintiff conclusorily disputes – that Plaintiff struggled greatly with the projects assigned to her, often taking much longer than expected to complete them. However, as the Court will explain below, the issues of fact created by the parties with respect to Plaintiff's work performance are irrelevant because Plaintiff has failed to offer any evidence from which this Court can find any inference of discrimination.

The fourth element of Plaintiff's prima facie case requires her to demonstrate that Defendants' decision not to renew her term appointment occurred "under circumstances giving rise to an inference of discrimination." Baldwin, 470 F. Supp. 2d at 228. Here, Plaintiff has failed to offer any evidence, other than her own conclusory allegations, that she was discriminated against on the basis of her national origin. Plaintiff has not presented any evidence that she was subjected to derogatory comments or that she was treated differently from other individuals with whom she worked. Nor did Plaintiff ever complain to anyone at SBU, either during her employment or after she left, that she was the subject of discrimination. There is simply nothing in the record before the Court from which a reasonable fact-finder could conclude that Plaintiff was discriminated against in any way. Accordingly, since Plaintiff is unable to demonstrate a prima facie case of discrimination, Defendants are entitled to judgment as a matter of law with respect to Plaintiff's claims under both Title VII and Section 1983.

Where, as here, there is no evidence of discrimination, it is not the province of the Court to "sit as a super-personnel department that reexamines an entity's business decisions." Delaney v. Bank of Am. Corp., 766 F.3d 163, 169 (2d Cir. 2014) (quoting Scaria v. Rubin, 117 F.3d 652, 655 (2d Cir. 1997)).

Based on the foregoing, the Court respectfully recommends that Defendants be granted summary judgment with respect to Plaintiff's claim of national origin discrimination pursuant to both Title VII and Section 1983.[3]

III.    The Court Should Decline to Exercise Supplemental Jurisdiction

Having found that Plaintiff's federal claims fails as a matter of law, there is no longer any independent basis for federal jurisdiction in the within action. Although the Court has discretion to exercise supplemental jurisdiction over Plaintiff's remining state law claims pursuant to the NYSHRL, see 28 U.S.C. § 1367(a), this Court recommends that the District Court decline to do so. See 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction . . . ."); Marcus v. AT&T Corp., 138 F.3d 46, 57 (2d Cir. 1998) ("In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well."). Accordingly, this Court respectfully recommends that Plaintiff's state law claims be dismissed without prejudice.[4]

---

[3] Because the Court finds that Plaintiff's Section 1983 claim fails as a matter of law, there is no need to reach Defendants' argument of qualified immunity with respect to the individual defendants, Le Viness and Testa.

[4] "Since [New York's CLPR § 205] allow[s] a plaintiff to recommence a dismissed suit within six months without regard to the statute of limitations, [plaintiff] will not be unduly prejudiced by the dismissal of her state law claims." Trinidad v. New York City Dept. of Corr., 423 F. Supp. 2d 151, 169 (S.D.N.Y. Mar. 21, 2006) (citation omitted) (alterations in original).

14

## RECOMMENDATION

For the foregoing reasons, this Court respectfully recommends that Defendants' motion for summary judgment, appearing at Docket Entry [126], be granted and that Defendants be awarded judgment as a matter of law with respect to Plaintiff's discrimination claims brought pursuant to Title VII and Section 1983. The Court further recommends that the District Court decline to exercise supplemental jurisdiction over Plaintiff's state law claims and that those claims be dismissed, without prejudice.

## OBJECTIONS

A copy of this Report and Recommendation is being provided to Defendant's counsel via ECF. Defendant's counsel is directed to serve a copy of this Report and Recommendation on the Pro Se Plaintiff, and to file proof of service on the docket sheet, within three days. Any written objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of filing of this report. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 72(b). Any requests for an extension of time for filing objections must be directed to the District Judge assigned to this action prior to the expiration of the fourteen (14) day period for filing objections. Failure to file objections within fourteen (14) days will preclude further review of this report and recommendation either by the District Court or Court of Appeals. Thomas v. Arn, 474 U.S. 140, 145 (1985) ("[A] party shall file objections with the district court or else waive right to appeal."); Caidor v. Onondaga Cnty., 517 F.3d 601, 604 (2d Cir. 2008) ("[F]ailure to object timely to a magistrate's report operates as a waiver of any further judicial review of the magistrate's decision").

**SO ORDERED.**

Dated: Central Islip, New York
July 20, 2020

                                                      /s/    Anne Y. Shields
                                                  ANNE Y. SHIELDS
                                                  United States Magistrate Judge